IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2021 Session

FAYE MAPLES HALL, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF ALIE NEWMAN MAPLES, DECEASED v. PARK GRILL, LLC

Appeal from the Chancery Court for Sevier County
No. 19-7-143        Telford E. Forgety, Jr., Chancellor

_____

No. E2020-00993-COA-R3-CV
_____

This case involves an alleged breach of a lease following the destruction of the building on the leased premises by the November 2016 Gatlinburg wildfires. The original lessor had entered into a lease in 2009 with the lessee, a company that had utilized the building primarily as a storage facility for its restaurants during the lease term. The lessor died in 2017. Acting in her own capacity and as personal representative of her mother's estate, the lessor's daughter filed a complaint in July 2019, alleging that the lessee had breached the lease by failing to utilize fire insurance proceeds to restore the building. The plaintiff requested that she be awarded a judgment for either the fair market value of the leased premises or the amount of the fire insurance proceeds. Upon cross-motions for summary judgment and following a hearing, the trial court found that the lease required the lessee to utilize fire insurance proceeds to make repairs only in the event that those repairs could be made within ten working days, which was undisputedly impossible following the fire. The trial court also found that, pursuant to Tennessee Code Annotated § 66-7-102(b), the lessee's covenant to leave the leased premises in good repair did not obligate the lessee to restore the building absent fault, negligence, or an express agreement to the contrary. The plaintiff has appealed. Discerning no reversible error, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

David H. Parton, Gatlinburg, Tennessee, for the appellant, Faye Maples Hall, individually and as personal representative of the Estate of Alie Newman Maples, deceased.

Tyler C. Huskey, Pigeon Forge, Tennessee, for the appellee, Park Grill, LLC.

# OPINION

## I. Factual and Procedural Background

On April 7, 2009, Alie Newman Maples, now deceased ("Decedent"), entered into a commercial lease ("the Lease") as the lessor with the defendant in this action, Park Grill, LLC ("Park Grill"), as the lessee. Geoffrey A. Wolpert, Park Grill's sole proprietor, entered into the Lease on behalf of Park Grill. The leased premises ("the Premises") consisted of improved real property located on Savage Gardens Drive in the City of Gatlinburg. The Lease provided for a ten-year term, expressly set to expire on June 30, 2019, and Park Grill agreed to pay $3,500.00 in annual rent plus property taxes on the Premises. Park Grill utilized the structure located on the Premises, described by both parties as a house ("the House"), as a storage facility for the benefit of two restaurants in Gatlinburg: The Park Grill, owned and operated by Park Grill, and The Peddler, owned and operated by Steaks Sophisticated, LLC, for which Mr. Wolpert is also the sole owner.

According to an affidavit executed by Mr. Wolpert and documents he submitted in discovery, he had previously leased the Property from Decedent's son beginning in 1994, and Mr. Wolpert entered into the Lease with Decedent following the death of her son. Mr. Wolpert stated in his affidavit that beginning in 1994, he had initially utilized the House as a daycare center for employees' children and then as a bakery for his restaurants, spending "not less than $143,604.33" on improvements to the Premises over the course of seven years from 1994 to 2002. However, Mr. Wolpert averred in his affidavit that by the time of the Lease's execution in 2009, he utilized the House solely as a storage facility. In March of 2010, Park Grill had subleased the basement of the House to Zipline Family Adventures, LLC ("Zipline"), for that company's storage purposes. Zipline, however, terminated the sublease three months later.

On November 28, 2016, the House was completely destroyed by the Gatlinburg wildfires. Mr. Wolpert, acting through Steaks Sophisticated, Inc., had secured a fire insurance policy covering the Premises with Berkley Southeast Insurance Group ("Berkley"). According to Mr. Wolpert's affidavit and documents submitted in discovery, upon deeming the House a total loss, Berkley had paid proceeds in the amount of $112,360.00 for the House and $20,000.00 for its contents, which were the values claimed by Mr. Wolpert. Decedent passed away in July 2017 at the age of ninety-six. The plaintiff, Faye Maples Hall, was named as the personal representative of Decedent's estate. It is undisputed that after the fire, neither party to the Lease terminated the Lease prior to the end of the term and that Park Grill continued to pay its annual rent to Ms. Hall after Decedent's death. It is also undisputed that after the fire and during the term of

the Lease, Park Grill cleaned the debris from the Premises and utilized temporary storage containers on the Premises.

On April 23, 2019, Ms. Hall's counsel sent a letter to Park Grill's counsel, demanding the fair market value of the destroyed House or, in the alternative, the amount of the fire insurance proceeds. In a reply dated April 30, 2019, Park Grill's counsel stated that unless the parties could satisfactorily negotiate a new lease, Park Grill "intend[ed] to retain the proceeds and to surrender the premises 'as-is' to [Ms. Hall] at the termination of the term" on June 30, 2019. However, Park Grill had previously tendered a check in the amount of $3,500.00 to Ms. Hall, accompanied by a note from Mr. Wolpert stating that the check was "for the annual rent due on July 1, 2019 for the lease on [the Premises] for the year July 1, 2019 through June 30, 2020."

The instant action commenced on July 1, 2019, when Ms. Hall filed a complaint in the Sevier County Chancery Court ("trial court"), alleging breach of the Lease and averring that the probate of Decedent's estate had been reopened in order to "enforc[e] the terms of the recently discovered written lease upon which this action is based." Ms. Hall averred that despite attempts to obtain a copy of the Lease from Park Grill, she had been unable to obtain the Lease until Decedent's caregiver had recently found a copy. In pertinent part, the Lease provides:

5. **Insurance.** Lessee shall have and maintain a fire and casualty insurance policy on these leased premises. Lessee shall obtain and keep in force a comprehensive general public liability policy in a sum of at least $100,000.00 for these premises.

\* \* \*

7. **Maintenance.** Lessee has examined these premises thoroughly and accept[s] the premises "as is". Lessee shall maintain the roof and outside of the building. Lessee shall maintain the interior of the building (including the doors and windows, the plumbing and light fixtures, and the heating and air conditioning systems). Lessee shall keep the interior of the leased premises in a clean and well-maintained and well-repaired condition at its own expense (including the doors and windows, the plumbing and light fixtures, and the heating and air conditioning systems) and shall save the Lessor harmless from all claims, injuries, damages, or expenses incident to the same. Any light fixtures and light bulbs, floor and wall coverings and fixtures attached in the windows and on the walls that have been provided by Lessee shall become a part of the realty

and may not be removed without Lessor's written consent. Lessee shall not make any major changes to these premises without first obtaining the Lessor's written consent. At the termination of this lease, these premises shall be turned over to Lessor in a clean and good condition, reasonable wear and tear excepted.

8. **Fire Loss.** In the event these premises are damaged by fire or other insurable loss, and the premises can be reasonably repaired within ten (10) working days, Lessee shall undertake to make these repairs using the proceeds of the insurance policy. Rental shall not abate. In the event these premises are damaged by fire or other loss and cannot be reasonably repaired within ten (10) working days, either party may elect to declare the lease terminated.

\* \* \*

10. **Default.** In the event Lessee does not pay rent timely (i.e. in advance on the 1st day of July each year), Lessor may declare this lease in default and terminated if the rental is not <u>received</u> by Lessor within seven (7) days after Lessee is given written termination notice.

In the event Lessee breaches any other provisions of this lease, Lessor may declare this lease in default and terminated if Lessee does not remedy the breach within seven (7) days after Lessee is given written notice of the breach.

11. **Attorney Fees.** In the event Lessor is required to employ an attorney relative to Lessee's breach, Lessee shall reimburse Lessor for the reasonable attorney fees that Lessor incurs.

Ms. Hall asserted in her complaint, *inter alia*, that the "Lease was not ambiguous, but clearly indicated that parties intended that if the building were destroyed by fire it would be replaced at [Park Grill's] expense, and required that [Park Grill] maintain a fire and casualty insurance policy to provide the necessary funds that would enable [Park Grill] to replace the improvements." Ms. Hall requested an award either in the amount of the fire insurance proceeds received by Park Grill or the replacement costs of the improvements on the Premises, as well as reasonable attorney's fees and costs. Ms. Hall averred that Decedent had not been mentally competent to handle her affairs at the time of the Gatlinburg wildfires. However, the complaint contained no allegation concerning Decedent's competency at the time of entering into the Lease.

- 4 -

Park Grill filed an answer on August 23, 2019, acknowledging the validity of the Lease while taking issue with Ms. Hall's interpretation. Specifically, Park Grill averred that "the terms of the Lease do not require [Park Grill] to rebuild the structure after its destruction, to name the Landlord as an additional insured, or to turn the insurance proceeds over to the Landlord." Park Grill denied that it had ignored efforts by Ms. Hall to obtain a copy of the lease, stating that upon Ms. Hall's first request, Mr. Wolpert had made a copy "readily available" for Ms. Hall to pick up at one of his restaurants. Alleging that Ms. Hall had failed to state a claim upon which relief could be granted, Park Grill also asserted the affirmative defenses of waiver, estoppel, and laches. Park Grill requested that the trial court dismiss Ms. Hall's complaint with prejudice and award discretionary costs to Park Grill.

On May 5, 2020, Park Grill filed a motion for summary judgment, again requesting that the trial court dismiss Ms. Hall's complaint with prejudice. Park Grill attached affidavits executed by Mr. Wolpert and Hugh Clabo, a contractor who opined that the House could not have been rebuilt in ten working days following the fire.

Ms. Hall filed a response and a motion for summary judgment on May 22, 2020, requesting that Park Grill's motion be denied and that summary judgment be awarded to her based on a theory of breach of the Lease. Ms. Hall attached four affidavits executed respectively by Decedent's caregiver, who was also by then Ms. Hall's caregiver; Jerry H. McCarter, an attorney who had drafted the Lease, stating in part that he remembered drafting the Lease but did not remember any specific agreements between the parties;[1] Shannon Akey, a contractor licensed in New York and working in the construction industry in Tennessee, who opined that it would cost approximately $344,000.00 to replace the building on the Premises; Darlene Derosia, a real estate broker in Gatlinburg who opined that the rent agreed to in the Lease was "very low rental for any home in Gatlinburg" and that an agreement that the tenant, *inter alia*, maintain all fire and casualty insurance coverage would have contributed to aligning the rent with fair market value in the area.

Ms. Hall also attached to her motion an assessor's "Property Report Card" for the 2016 tax year, reflecting that the land on the Premises had been appraised at $61,300.00 and that the improvements had been appraised at $124,800.00 for a total appraised value in the amount of $186,100.00. Ms. Hall requested an award of damages in the amount of

---

[1] It is not clear from the record which party to the Lease was represented by Mr. McCarter when he drafted the Lease. In his affidavit, Mr. McCarter stated in part: "My recollection is vague at best, but I believe Geoffrey Wolpert from Park Grill called me with regard to preparing the lease . . . ." Throughout the proceedings, Mr. Wolpert denied that Mr. McCarter had represented Park Grill or him personally, and Ms. Hall disputed whether Mr. McCarter had represented Decedent.

$344,000.00 as the replacement cost of the House; lost rental income in the amount of $800.00 per month, to include "all insurance proceeds from the required insurance coverage that were paid on account of this loss;" and reasonable attorney's fees pursuant to the Lease.

The parties subsequently filed respective responses and replies to the cross-motions for summary judgment, as well as responses to discovery requests. Ms. Hall filed a motion for leave to amend her complaint on June 19, 2020, seeking to add claims of negligence and breach of contract due to Park Grill's alleged "fail[ure] to purchase and maintain adequate insurance coverage on the [P]remises," which Ms. Hall claimed to have discovered through documents produced in discovery. The trial court conducted a hearing on June 24, 2020, concerning, *inter alia*, the summary judgment motions. The transcript of the hearing reflects an oral ruling by the trial court that Ms. Hall's motion to amend the complaint was not timely to be considered in conjunction with the motions for summary judgment.

The trial court entered an order on July 10, 2020, granting summary judgment in favor of Park Grill and dismissing Ms. Hall's complaint with prejudice. Incorporating its memorandum opinion into the final order, the trial court found, *inter alia*, that the language of the Lease unambiguously "included the duty to carry insurance and use the insurance to repair the building if it could be repaired in ten days" but did not create "a duty from the lessee to the lessor to do anything more than that." Applying the canon of statutory construction of *expressio unius est exclusio alterius*, "which holds that the expression of one thing implies the exclusion of others," *see Rich v. Tenn. Bd. of Med. Exam'rs*, 350 S.W.3d 919, 927 (Tenn. 2011), the trial court found that the inclusion of paragraph eight in the Lease, the "fire loss" provision, requiring Park Grill to make repairs that could reasonably be made within ten days, implied the exclusion of a duty to make repairs that could not reasonably be made within ten days. Ms. Hall timely appealed.

## II. Issues Presented

Ms. Hall presents two issues on appeal, which we have restated slightly as follows:

1.    Whether the trial court erred by improperly applying the maxim of *expressio unius est exclusio alterius* in interpreting the Lease.

2.    Whether the trial court erred by declining to find that Park Grill's purportedly unconditional covenant to make all major repairs to the Premises during the term of the lease and agreement to "have and

maintain a fire and casualty insurance policy" on the Premises were sufficient to make Park Grill responsible for restoration of the Premises after a fire loss.

## III.  Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness.  *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)).  As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied."  *Rye*, 477 S.W.3d at 250.  As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.  We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis.  Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial."  Tenn. R. Civ. P. 56.03.  "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record."  *Id.*  When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03.  "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial."  Tenn. R. Civ. P. 56.06.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S. Ct. 1348, [89 L.Ed.2d 538 (1986)].  The nonmoving party must demonstrate the

existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

"The legal effect of the terms of a lease are governed by the general rules of contract construction." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn. 2002). A trial court's interpretation of a contract is a matter of law, which we review *de novo* with no presumption of correctness. *See Ray Bell Constr. Co. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Dick Broad.*, 395 S.W.3d at 659. As this Court has previously explained:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78

S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d, Contracts, § 245).

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005).

Resolution of the issues before us also depends in part on statutory interpretation, which is a question of law that we review *de novo* with no presumption of correctness. *See In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). Our Supreme Court has summarized the principles involved in statutory construction as follows:

When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at

the time the legislation passed. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995).

*Id.* at 613-14.

## IV. Interpretation of the Lease

Ms. Hall contends that the trial court erred by granting summary judgment in favor of Park Grill because the court erroneously interpreted the Lease as not requiring Park Grill to utilize fire insurance proceeds to fund a complete replacement of the House. Ms. Hall specifically argues that the trial court erred in its interpretation of the Lease by (1) applying the maxim of *expressio unius est exclusio alterius* to the "fire loss" provision of the Lease and (2) declining to find that the provisions in the Lease concerning repairs and maintenance of fire and casualty insurance were sufficient to make Park Grill responsible for full restoration of the Premises after a fire loss. Park Grill contends that in granting summary judgment, the trial court properly interpreted the plain meaning of the Lease together with the statutory provision contained in Tennessee Code Annotated § 66-7-102(b) concerning the extent of a lessee's covenant to leave or restore premises in good repair.

In granting summary judgment in favor of Park Grill, the trial court specifically found in pertinent part:

> There's no question here both sides agree the property could not – the house could not reasonably be repaired within ten days. It's totally destroyed. Just couldn't be reasonably repaired within ten days. Paragraph eight contains no provision about – no other provision, let's say, about total destruction. And it contains no provision whatsoever about use of the fire insurance proceeds in the event the house is totally destroyed. So add in paragraph eight a provision that speaks specifically to the use of the insurance proceeds, in the event the property is damaged, and can be repaired within ten days, we have no provision as to the use of the insurance proceeds in the event the property cannot be repaired within ten days. Had no provision one way or the other.
>
> * * *
>
> In this case the parties specifically contracted for insurance and that the insurance was to be used to repair the property if it could be repaired within ten days. They specifically agreed for that. And they agreed for that in

- 10 -

paragraph eight, the caption of which – of the lease, the caption of which is fire loss.

It seems to the Court that if these parties had meant to contract for use of the insurance proceeds in the event of total destruction, they would have gone ahead and said so in paragraph eight, but they didn't. They didn't say so. With respect – again, I go back to the doctrine of inclusio unius or expressio unius. The expression of the one thing, the inclusion of the one thing generally means the exclusion of all others. The parties chose to include a provision about use of the insurance proceeds to repair the property if it could be repaired within ten days. They excluded, did not address use of the insurance proceeds in the event of total destruction. Under the doctrine of expressio or inclusio unius that meant that everything else as to use of the insurance proceeds was excluded. That is everything other than repair of the building, if it could be repaired within ten days.

And once again, there is no other provision in this lease at all whatsoever anywhere that specifically requires the tenant to rebuild in the event of total destruction. There's no provision in it whatsoever.

The parties have referred to Tennessee Code Annotated 66-7-102(b), most particularly of the statute. Says a covenant or promise by the lessee to leave or restore the premises in good repair, which we have here. That's in this lease. It's in most every lease that you'll ever see, isn't it. Covenant or promise by the lessee to leave or restore the premises in good repair shall not have the effect to bind the lessee to erect or pay for such buildings as may be so destroyed, unless in respect to the matter of loss or destruction. There was neglect or fault on the lessee's part. And there's no question, there was no negligence or fault on the part of the lessee. This is part of the Gatlinburg wildfires that burnt this building down so that phrase has no application here.

Or unless the lessee has expressly stipulated in writing to be so bound. That phrase, unless the lessee has expressly stipulated in writing to be bound, meaning what? To be bound to erect or pay for such buildings as may be so destroyed. That's what that very last phrase refers to. And there's nothing, again, in this lease that – where[by] the lessee expressly stipulated in writing to be bound to erect or pay for such buildings as may be so destroyed. Just not in the lease, once again.

- 11 -

In this case, as in my – as in the previous case that I had, the *Johnson* case. It was [*Johnson Real Estate Ltd. P'ship v. Vacation Dev. Corp.*, No. E2017-01774-COA-R3-CV, 2018 WL 2948421 (Tenn. Ct. App. June 12, 2018)]. Either party here – both parties here, lessor or lessee had an insurable interest in the premises. Here they either one could have insured their respective interests in the event of total destruction. Here the lessee – unlike the *Johnson* case, here the lessee did have a duty under the lease to maintain fire and casualty insurance at least for the purpose of repairing the building if it was possible to repair it within ten days. But the lessee could have also, and did apparently also, go forward and insure its own interest beyond that. But the Court holds that all the lessee owed the lessor . . . under the lease was to keep fire insurance on it for the purpose of repairing the premises if it could be done within ten days. Any insurance the lessee carried beyond that was an insurance in the Court's opinion, the lessee carried for its own interest as the lease holder. The lessor could have carried insurance, likewise to insure her interest in the event of total destruction. But the Court simply cannot find here that there was a duty, or an agreement between the parties for the lessee to carry insurance to cover the rebuilding of the property in the event of a total destruction of it.

* * *

I do think this case is closer than the *Johnson* case was, and the *Johnson* case that I remember there simply was no provision whatsoever about insurance. Here at least you got a provision. But once again, the provision is specific. And it included the duty to carry insurance and use the insurance to repair the building if it could be repaired in ten days. It didn't create, in the Court's opinion, a duty to do anything – a duty from the lessee to the lessor to do anything more than that.

Again, if the parties had intended such a duty they would have said so and they would have said so in paragraph eight. Under the paragraph of the lease that – the caption of which reads fire loss. That's where the provision would have been. Should have been if there had been one, and intended it would have been there.

The Court simply cannot go back and rewrite the lease, or rewrite paragraph eight to include something that was not there by the parties['] agreement in the first place. Accordingly, the Court will grant summary judgment to [Park Grill], and will overrule [Ms. Hall's] Motion for Summary Judgment.

Upon careful review of the record and applicable authorities, we agree with the trial court's interpretation of the Lease. We will address each of Ms. Hall's arguments in turn.

## A. Application of *Expressio Unius est Exclusio Alterius*

Ms. Hall asserts that the trial court improperly applied the maxim of *expressio unius est exclusio alterius* "to allow an ambiguous mention [of fire loss] in a later section of a document [to] defeat a clear expression of the parties' intent in entering the lease." We disagree. As this Court has explained within the context of contract interpretation:

> It is also a well known rule of construction that where general and specific clauses conflict, the specific clause governs the meaning of the contract. 11 Williston on Contracts § 32:10 (4th ed.); *City of Knoxville v. Brown,* 195 Tenn. 501, 260 S.W.2d 264, 268 (Tenn. 1953) (order on petitions to rehear) ("The doctrine of Ejusdem Generis based on the maxim expressio unius est exclusio alterius is: that, where general words are used, followed by a designation of particular things or subject to be included or excluded as the case may be, the inclusion or exclusion will be presumed to be restricted to the particular thing or subject") (quoting Ballentine's Law Dictionary, 2nd ed.); *Magevney v. Karsch,* 167 Tenn. 32, 65 S.W.2d 562, 571 (Tenn. 1933) ("There is no rule better established with reference to the construction of written instruments than that the exception of particular things from general words shows that the things excepted would have been within the general language, had the exceptions not been made.").

*Richmond v. Frazier*, No. E2008-01132-COA-R3-CV, 2009 WL 2382303, at *7 (Tenn. Ct. App. Aug. 4, 2009). *See S.M.R. Enters., Inc. v. S. Haircutters, Inc.*, 662 S.W.2d 944, 949 (Tenn. Ct. App. 1983) (explaining in the context of interpreting a contract that *expressio unius est exclusio alterius* means that "the expression of one implies the exclusion of the others" or "[s]tated differently, where a contract by its express terms includes one or more things of a class it simultaneously implies the exclusion of the balance of that class.").

Ms. Hall's argument is premised on her assertion that the Lease's provision entitled, "Fire Loss," is ambiguous. The provision, which is paragraph eight of the Lease, states in full:

> In the event these premises are damaged by fire or other insurable loss, and the premises can be reasonably repaired within ten (10) working days, Lessee shall undertake to make these repairs using the proceeds of the

insurance policy. Rental shall not abate. In the event these premises are damaged by fire or other loss and cannot be reasonably repaired within ten (10) working days, either party may elect to declare the lease terminated.

We do not find this provision to be ambiguous. It provides for two possible outcomes in the event that the Premises are damaged by fire or other insurable loss. The first outcome is that the lessee, Park Grill, "shall undertake to make these repairs using the proceeds of the insurance policy." We note that the coordinating conjunction, "and," joins two conditions for this first outcome: (1) that the Premises "are damaged by fire or other insurable loss" and (2) that the Premises "can be reasonably repaired within ten (10) working days." *See Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 21 (Tenn. Ct. App. 2002) (citing with approval the definition of "and" in BLACK'S LAW DICTIONARY 86 (6th ed. 1990) as a "conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first"). The second outcome provided in paragraph eight of the Lease is that "either party may elect to declare the lease terminated." This outcome is also preceded by two clear conditions joined together: (1) that the Premises "are damaged by fire or other loss" and that (2) the Premises "cannot be reasonably repaired within ten (10) working days."

As the trial court found, it is undisputed that the Premises could not be reasonably repaired within ten working days. Therefore, the first outcome, that of Park Grill's utilizing fire insurance proceeds to make the repairs, was not applicable. Ms. Hall takes some issue with the fact that Park Grill did not avail itself of the second outcome provided in paragraph eight by electing to terminate the Lease immediately upon learning that Berkley had deemed the House a total loss due to the fire. However, the second outcome is a permissive one in that either party may elect to terminate the Lease in the event that the damages cannot be repaired within ten working days. The provision does not require either party to terminate the Lease. *See Eberbach v. Eberbach*, 535 S.W.3d 467, 474 n.3 (Tenn. 2017) (recognizing that a contractual provision "contain[ing] only permissive language, such as 'may award,'" is discretionary in nature); *Huey v. King*, 415 S.W.2d 136, 139 (Tenn. 1967) ("It is well settled that the term 'may' does not confer on a person a mandatory duty; the term is permissive and operates to confer a discretion."). Additionally, the fire loss provision requires that "[r]ental shall not abate," indicating that Park Grill must continue to make rental payments in either situation until the Lease is terminated. It is undisputed that Park Grill continued to make the $3,500.00 annual rental payments due under the Lease through the end of the term.

Contrary to Ms. Hall's argument, we do not find that the trial court utilized solely the maxim of *expressio unius est exclusio alterius* in interpreting the plain language of the Lease, ignored precedent, or applied the maxim improperly. Ms. Hall relies on two Tennessee Supreme Court decisions urging caution in applying the maxim. *See City of*

- 14 -

*Knoxville v. Brown*, 260 S.W.2d 264 (Tenn. 1953); *Assoc. Indem. Corp. of San Francisco, Cal. v. McAlexander*, 79 S.W.2d 556 (Tenn. 1935). In *Brown*, our Supreme Court applied the maxim of *expressio unius est exclusio alterius*, also known as the doctrine of *ejusdem generis*, to the interpretation of a zoning ordinance, determining that the defendant's use of "his yard or lot in this neighborhood to assemble and put together eight or nine automobiles" was in violation of the ordinance because it was not one of the permissible uses "clearly designated" under the ordinance. *Brown*, 260 S.W.2d at 267. Upon the defendant's petition to rehear, the *Brown* Court explained the purpose of the maxim further, stating in pertinent part:

> The 'doctrine of Ejusdem Generis' is not a rule of law but is merely an aid to the judicial mind in the interpretation of a statute or other writing. 'The doctrine of Ejusdem Generis based on the maxim expressio unius est exclusio alterius is: that, where general words are used, followed by a designation of particular things or subject to be included or excluded as the case may be, the inclusion or exclusion will be presumed to be restricted to the particular thing or subject. Ballentine's Law Dictionary, 2nd Edition, Page 24. Literally translated, the phrase, expressio unius est exclusio alterius, means: the expression of one thing is the exclusion of another (of the same kind). Whilst the rule is more frequently applied to the construction of statutes and wills, it equally is applicable to other instruments of writing.

*Id.* at 268 (additional internal citations omitted). Noting again that the maxim "is not a rule of law but a mere aid to our interpretation of what is meant by the ordinance," the High Court maintained that the doctrine was applicable to the ordinance at issue and confirmed its original holding. *Id.* at 269.

Likewise, in its earlier *Assoc. Indem. Corp.* decision, our Supreme Court urged caution in applying the maxim of *expressio unius est exclusio alterius* "lest it may be used for the purpose of defeating rather than subserving the real intent of the parties." *Assoc. Indem. Corp.*, 79 S.W.2d at 562 (quoting *Gage v. Tirrell*, 9 Allen 299, 305, 1864 WL 3477 (Mass. 1864)). In *Assoc. Indem. Corp.*, the defendant insurance company argued in relevant part that because the liability of a manufacturing company owning a fleet of automobiles had been expressly preserved in the policy in the event of the company's bankruptcy or insolvency, the liability of an additional assured, specifically an officer with the manufacturing company who had been driving a company vehicle when a fatal accident occurred, was impliedly excluded. 79 S.W.2d at 562. Determining that the clause relied upon by the defendant did not exclude the manufacturing company's liability, our High Court declined to apply the maxim of *expressio unius est exclusio alterius*, concluding:

- 15 -

> If the previously assumed absolute and unconditional obligation to pay any judgment rendered against the additional assured was intended to be destroyed by this clause, the object easily could have been attained by expressly so stating, and not leaving the question of such liability involved in ambiguity and obscurity.

*Id.* In contrast, we determine that the trial court in the case at bar did not rely upon an ambiguous or obscure provision in the Lease to defeat an express covenant. Instead, the trial court found that a plain and unambiguous provision, expressly titled, "Fire Loss," applied to the parties' agreement concerning how fire insurance proceeds should be utilized.

The trial court analyzed the Lease as a whole and found that although paragraph five required Park Grill to maintain a fire and casualty insurance policy on the Premises, that paragraph included no requirement concerning the amount of such a policy or how the proceeds were to be used. Paragraph five does require a specific amount of coverage, $100,000.00, for liability insurance but states no such express amount for fire and casualty. Instead, paragraph eight, "Fire Loss," requires that Park Grill must use insurance proceeds to repair the Premises in the event that those repairs could be reasonably made "within ten (10) working days." As the trial court noted, this specific fire loss provision is the only provision in the Lease directing the parties' actions in the event of fire loss and the only provision directing Park Grill's actions in utilizing the fire insurance proceeds. The trial court examined the provision concerning fire loss in paragraph eight to find that, taken together with the rest of the Lease, the express fire loss terms implied the exclusion of any other requirement for the use of the fire insurance policy. *See S.M.R. Enters.,* 662 S.W.2d at 949. We discern no error in the trial court's application of the maxim to the plain language of the Lease.

## B. Restoration of the House

Ms. Hall also asserts that the trial court erred by declining to find that the provisions in the Lease for Park Grill to keep the Premises in good repair; "turn[] over" the Premises "in a clean and good condition, reasonable wear and tear excepted"; and "maintain a fire and casualty insurance policy" combined to render Park Grill responsible for full restoration of the Premises after a fire loss. Park Grill argues that the trial court properly found that, pursuant to Tennessee Code Annotated § 66-7-102(b), Park Grill's promise to return the Premises to the lessor in good condition did not bind Park Grill to restore the destroyed House. Park Grill also argues that the trial court properly found that under the plain meaning of the insurance and fire loss provisions in the Lease, Park Grill was required to maintain fire insurance on the Premises only to the extent that it was

required to make fire damage repairs that could reasonably be completed within ten working days. Upon careful review, we agree with Park Grill and the trial court.

Tennessee Code Annotated § 66-7-102 (2015) provides:

> (a)   Where any building which is leased or occupied is destroyed or so injured by the elements, or any other cause, as to be untenantable and unfit for occupancy, and no express agreement to the contrary has been made in writing, the lessee or occupant may, if the destruction or injury occurred without fault or neglect by the lessee, surrender possession of the premises, without liability to the lessor or owner for rent for the time subsequent to the surrender.
>
> (b)   A covenant or promise by the lessee to leave or restore the premises in good repair shall not have the effect to bind the lessee to erect or pay for such buildings as may be so destroyed, unless in respect of the matter of loss or destruction there was neglect or fault on the lessee's part, or unless the lessee has expressly stipulated in writing to be so bound.

*See EVCO Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975) (recognizing that in enacting an earlier version of this statute, the General Assembly had overruled a prior holding in *Zuccarello v. Clifton*, 12 Tenn. App. 286, 292 (Tenn. Ct. App. 1930), that a tenant was bound by a covenant to repair in the lease despite the destruction of the building by fire); *see also Johnson Real Estate Ltd. P'ship v. Vacation Dev. Corp.*, No. E2017-01774-COA-R3-CV, 2018 WL 2948421, at *2 (Tenn. Ct. App. June 12, 2018), *perm. app. denied* (Tenn. Oct. 10, 2018) (recognizing same).

Entitled, "Maintenance," Paragraph seven of the Lease provides:

> Lessee has examined these premises thoroughly and accept[s] the premises "as is". Lessee shall maintain the roof and outside of the building. Lessee shall maintain the interior of the building (including the doors and windows, the plumbing and light fixtures, and the heating and air conditioning systems). Lessee shall keep the interior of the leased premises in a clean and well-maintained and well-repaired condition at its own expense (including the doors and windows, the plumbing and light fixtures, and the heating and air conditioning systems) and shall save the Lessor harmless from all claims, injuries, damages, or expenses incident to the same. Any light fixtures and light bulbs, floor and wall coverings and fixtures attached in the windows and on the walls that have been provided

by Lessee shall become a part of the realty and may not be removed without Lessor's written consent.  Lessee shall not make any major changes to these premises without first obtaining the Lessor's written consent.  <u>At the termination of this lease, these premises shall be turned over to Lessor in a clean and good condition, reasonable wear and tear excepted.</u>

(Emphasis added.)  The trial court found that the Lease contained a "covenant or promise by the lessee to leave or restore the premises in good repair," as described in Tennessee Code Annotated § 66-7-102(b).  We note that in the "Maintenance" provision, this is the final sentence of the paragraph, as underlined above.  Ms. Hall posits that in the provision as a whole, Park Grill promised to perform all major repairs on the Premises during the term of its leasehold and that such a covenant means that any repairs needed, including the restoration of the destroyed House, would be included in Park Grill's responsibilities under the Lease.  However, analyzing the plain language of the provision, we determine that although Park Grill did promise at its own expense to "maintain the roof and outside" of the House and to keep the interior "in a clean and well-maintained and well-repaired condition," the parties did not contemplate in this provision complete restoration of the House following its total destruction.  We determine that the closing sentence of the "Maintenance" provision is Park Grill's covenant "to leave or restore the premises in good repair" and is therefore governed by Tennessee Code Annotated § 66-7-102(b).

Absent negligence or fault on the part of Park Grill in causing the fire or an express stipulation in writing that Park Grill would be bound to restore the House in the event of its destruction, Park Grill's promise to turn over the Premises to the lessor, now Ms. Hall, in "a clean and good condition" did not bind Park Grill to rebuild or restore the House.  *See* Tenn. Code Ann. § 66-7-102(b).  As the trial court noted, it is undisputed that Park Grill bore no fault, whether direct or through negligence, in the destruction of the House by the Gatlinburg wildfires.  Under the statute, the question then becomes whether Park Grill expressly stipulated to a duty to restore the House upon the House's total destruction by fire.  Ms. Hall argues that the maintenance provision in the Lease, coupled with the agreement to obtain fire and casualty insurance, constitutes this express stipulation.  We disagree.

Paragraph five of the Lease, entitled, "Insurance," provides:

<u>Lessee shall have and maintain a fire and casualty insurance policy on these leased premises.</u>  Lessee shall obtain and keep in force a comprehensive general public liability policy in a sum of at least $100,000.00 for these premises.

(Emphasis added.) The underlined sentence pertains to fire and casualty insurance. Unlike the corresponding provision for liability insurance, the original parties to the Lease, Decedent and Park Grill, did not specify an amount for the fire and casualty insurance coverage and did not specify in this paragraph the extent of the damage to be covered by the policy. Moreover, as we have determined in the preceding section of this opinion, the parties to the Lease did expressly agree in the subsequent "Fire Loss" provision that Park Grill would use proceeds from the fire insurance to make repairs to the Premises after a fire loss in the event that "the premises can be reasonably repaired within ten (10) working days." Ms. Hall does not dispute that the fire damage to the House could not reasonably be repaired within ten working days.

The trial court, in its summary judgment order, noted similarities between the instant action and this Court's decision in *Johnson*, which was a previous case involving the 2016 Gatlinburg wildfires that had come before the same trial court. *See Johnson*, 2018 WL 2948421, at *1. In *Johnson*, the plaintiff real estate company was the lessor, having entered into a ground lease with the defendant development company, which had, pursuant to the parties' lease, constructed a motel on the leased premises. *Id.* Although the *Johnson* parties' lease included a provision for public liability insurance, it contained no provision for property insurance. *Id.* The motel was destroyed by the Gatlinburg wildfires, and at the time of the loss, the lessee had maintained an insurance policy for the leased premises and another of its commercial properties with a policy limit of a little over $8,000.00. *Id.* Upon notification that the lessee would not rebuild the motel unless a new lease could be negotiated that included a property insurance provision, the lessor filed a lawsuit alleging anticipatory breach of the agreement. *Id.* The lessee then surrendered the leased premises and terminated the lease pursuant to Tennessee Code Annotated § 66-7-102. *Id.* Upon the parties' cross-motions for summary judgment, the trial court granted summary judgment in favor of the lessee, and this Court affirmed, concluding that "the plain language" of Tennessee Code Annotated § 66-7-102 "unambiguously removes any obligation to rebuild, unless the Parties contracted otherwise." *Id.* at *4.

The parties in the case at bar each point respectively to the following language in the *Johnson* Court's decision: "Our plain reading of the statute [§ 66-7-102] leads us to conclude that the statute controls when the Parties did not contract to rebuild or insure the Motel in the case of destruction by the elements." *See id.* at *3 (emphasis added). Ms. Hall asserts that the parties in this case did contract for Park Grill to insure the Premises and to use the insurance proceeds to restore the House when it was destroyed by fire. While acknowledging that the parties contracted for Park Grill to obtain a fire and casualty insurance policy, Park Grill asserts that the extent to which Park Grill was required to utilize the proceeds of that policy to make repairs to the House was limited by agreement in the fire loss provision to repairs that could reasonably be made within ten

working days. We agree with Park Grill. Although, as the trial court found, either Ms. Hall or Park Grill was free to insure the Premises for a greater amount in order to protect each party's respective investment, under the plain and unambiguous language of the Lease, Park Grill was only required by the Lease to utilize fire insurance proceeds to repair the Premises if those repairs could reasonably be made within ten working days. The parties did not contract to require Park Grill to restore or rebuild the House in the event of destruction by fire. Furthermore, the Lease did not require Park Grill to name the lessor as an additional insured and did not require a specific amount of fire insurance coverage.

Ms. Hall also attempts to distinguish the instant action from the *Johnson* decision because the *Johnson* lessee availed itself of the statutory remedy of surrendering the leased premises and terminating the lease. *See Johnson*, 2018 WL 2948421, at *2. We determine this to be a distinction without a substantive difference under the facts of the case before us. In an earlier subsection of this opinion, we have noted the permissive language in the subject Lease providing that "either party may elect to declare the lease terminated" in the event that damages to the Premises from fire loss could not reasonably be repaired within ten working days. Similarly, Tennessee Code Annotated § 66-7-102(a) provides that a lessee may "surrender possession of the premises, without liability to the lessor or owner for rent for the time subsequent to the surrender" when a leased building "is destroyed or so injured by the elements, or any other cause, as to be untenantable and unfit for occupancy" through no "fault or neglect by the lessee" and when "no express agreement to the contrary has been made in writing." However, under the statute, the lessee is not required to surrender the premises provided that the lessee continues to pay rent. *See EVCO*, 528 S.W.2d at 23-24 (explaining under a prior version of the statute that the lessee's "statutory right to surrender the premises and be relieved of any further rental payments" is "an optional remedy of a tenant, and is not compulsory"). It is undisputed that Park Grill continued to pay rent through the end of the Lease's term. The fact that Park Grill elected not to surrender the Premises and be relieved of the duty to pay rent has no bearing on the parties' agreement regarding fire loss and insurance.

In support of her position that Park Grill had covenanted to restore the House in the event of destruction by fire, Ms. Hall relies heavily on our Supreme Court's decision in *EVCO* while also acknowledging the distinction that *EVCO* involved the commercial lessors' duty, rather than a lessee's duty, to restore the leased premises following a fire loss. *See EVCO*, 528 S.W.2d at 22. In *EVCO*, the intermediate appellate court had affirmed the trial court's finding that "the covenant of the lessors . . . to make major repairs and to insure against any damage to the building by fire was only a limited or special covenant, and not a general one, and that there was no duty to rebuild in the event of total destruction." *Id.* The High Court reversed, determining that the covenant was not "special or limited" because "[i]t was an unconditional covenant to make all major

repairs to the premises during the term of the lease coupled with an agreement on the part of the lessors to procure fire insurance upon the building 'for any damage thereto by fire.'" *Id.*

Apart from the inverted roles of the parties, we find the key distinctions between the lease in *EVCO* and the Lease in this action to be that (1) the *EVCO* lessors had agreed to "'carry fire insurance upon the building structure for <u>any damage</u> thereto by fire'" (emphasis added) and (2) had not entered into any provisions limiting or contradicting this general duty. *See id.* at 21-24. Furthermore, the provisions in the *EVCO* lease concerning repairs stated that the lessee would be responsible for "minor repairs" while the lessors would "be responsible for all major repairs that may become necessary to the building structure during the term of the lease . . . ." *Id.* at 21. Despite Ms. Hall's assertion that the "Maintenance" provision in the Lease at issue here covered all major repairs, we do not find the provision as broad as the repair covenant in the *EVCO* lease. The instant Lease lists specific items to be maintained, such as the roof and heating and cooling systems, but does not include a term comparable to the "building structure" set forth in the *EVCO* lease. Most importantly, however, the insurance provision in the Lease in the instant action provides only that Park Grill would have and maintain fire and casualty insurance, as contrasted to the *EVCO* lease's provision for coverage of "any damage" by fire, and the instant Lease includes an express "fire loss" provision limiting the utilization of fire insurance proceeds to repairs that could reasonably be made within ten working days. The *EVCO* parties agreed to no such limitation. We determine Ms. Hall's reliance on *EVCO* to be unavailing.

Ms. Hall also relies on this Court's decision in *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948 (Tenn. Ct. App. 1986). In *St. Paul*, the lessee of a commercial building had promised in the lease agreement to "'repair, *replace* and maintain . . . all buildings and any improvements . . . .'" *See St. Paul Surplus Lines*, 725 S.W.2d at 951 (emphasis supplied by *St. Paul* Court). The parties had also expressly agreed that the lessee was required "'to obtain and maintain at its expense fire insurance.'" *Id.* Noting the "somewhat analogous situation in reverse" in *EVCO*, the *St. Paul* Court determined that because the lessee in the case before it had "agreed to repair or replace the building, and agreed to insure for fire," the lessee "was obligated under the lease to replace the building, and obviously the fund from the fire insurance policies were to be used for that purpose." *Id.* at 951-52 (citing *EVCO*, 528 S.W.2d at 22-24).

We find *St. Paul* to be highly factually distinguishable from the instant action because the parties in *St. Paul* had expressly agreed that the lessee would "replace" "all buildings and improvements" and because the *St. Paul* lease contained no provision limiting the utilization of the fire insurance proceeds that the lessee was required to maintain. *See St. Paul Surplus Lines*, 725 S.W.2d at 951-52. As Ms. Hall notes, the

lessors in *St. Paul* were satisfied with the insurance funds that would have covered replacement as a remedy and did not insist upon the lessees actually replacing the building. *See id.* at 952. However, the central issue was whether the lessees had obligated themselves in the lease to apply all of the fire insurance proceeds toward replacement. *Id.* at 950. The *St. Paul* Court gave "the language in the lease agreement its usual, natural, and ordinary meaning," and we must likewise give the language in the subject Lease before us its usual, natural, and ordinary meaning. *See id.* at 951. Park Grill did not contract in the Lease to <u>replace</u> the House as the *St. Paul* lessee did, but Park Grill did contract to limit its utilization of insurance proceeds from fire loss to the Premises to repairs that could reasonably be made within ten working days.

We likewise determine Ms. Hall's reliance on a nineteenth-century Tennessee Supreme Court case, *Hayes v. Ferguson*, 83 Tenn. 1 (1885), to be unavailing. It is true that in *Hayes*, after a leasehold was destroyed by fire and the insurance company presented payment of the insurance proceeds to the lessees, the High Court determined that the funds should be awarded to the lessors as the property owners. *See Hayes*, 83 Tenn. at 2. However, in *Hayes*, the insurance policy had been "taken out in the name of [the property owners and their] children, and insured their property and interest, not the leasehold interest of the [lessees]." *Id.* at *4. The *Hayes* Court determined that a clause in the parties' agreement stating, "Loss, if any, payable to [the lessees]," did not entitle the lessees to retain the insurance proceeds because the lessees' duty under the parties' agreement was to "rebuild the gin-house and other property destroyed by fire, or to put up buildings of the same character, suitable to carry on the operations of the plantations." *Id.* at *4-5. In the case at bar, pursuant to the Lease, the fire and casualty insurance policy was taken out in the name of the lessee, Park Grill, and as previously determined, the fire loss provision of the Lease limited Park Grill's duty in utilizing the insurance proceeds taken out in its own name to making repairs to the House in the event that those repairs could reasonably be made within ten working days.

Ms. Hall attempts to draw a line between the issue presented here and precedent involving an insurance carrier's attempt to assert subrogation rights against a tenant who negligently caused a fire when the insured was the tenant's landlord. *See Dattel Family Ltd. P'ship v. Wintz*, 250 S.W.3d 883 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Feb. 25, 2008). Adopting what it termed the "*Sutton* approach," *see Sutton v. Jondahl*, 532 P.2d 478, 482 (Okla. Civ. App. 1975), this Court held that "absent an express agreement to the contrary, a tenant should be considered a co-insured under the landlord's property casualty insurance policy, and the insurance carrier should therefore be precluded from asserting subrogation rights against the tenant," *Dattel*, 250 S.W.3d at 892. Noting that the *Dattel* Court had cited with approval a federal district court decision applying Tennessee law, *see id.*, Ms. Hall relies on *Tate v. Trialco Scrap, Inc.*, 745 F.

Supp. 458 (M.D. Tenn. 1989), to argue that under the instant Lease, Decedent enjoyed status as a co-insured with Park Grill on the fire and casualty insurance.

In *Tate*, the district court was presented with the task of applying Tennessee law to solve the question presented of "whether the provision requiring the lessor to purchase insurance coverage for the building when viewed as part of the whole lease, relieves the lessee from liability for the fire it negligently started." *Tate*, 745 F. Supp. at 461. Finding no Tennessee precedent directly on point, the district court reviewed several authorities to conclude that "the Tennessee Supreme Court would adopt the modern rule that an agreement for the lessor to purchase insurance will be presumed to be for the mutual benefit of both parties unless there is a clear expression of contrary intent." *Id.* at 475. Ms. Hall essentially asks this Court to extend the conclusion in *Tate* to the inverse situation and hold that an agreement for the lessee to purchase insurance is presumed to be for the mutual benefit of both parties. This we decline to do.

First, we recognize that although a federal district court's decision may be persuasive authority for this Court, it is not controlling. *See Summers Hardware & Supply Co. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990) ("Cases from other jurisdictions, including federal cases, are always instructive, sometimes persuasive, but never controlling in our decisions."). Second, given the nature of the subrogation issue presented in *Tate*, as well as the public policy arguments set forth to support a lessor's obligation, *see* Tate, 745 F. Supp. at 473, we find *Tate* to be highly distinguishable from the case at bar. Finally, we emphasize again our previous determination that the parties to the instant Lease expressly agreed to a limited application of the fire insurance proceeds in the fire loss provision of the Lease, or what the *Tate* Court termed, "a clear expression of contrary intent." *See id.* at 475.

Given the plain and unambiguous language of the Lease and the clear application of Tennessee Code Annotated § 66-7-102(b), we determine that the trial court did not err in its interpretation of the Lease as binding Park Grill to utilize fire insurance proceeds to make repairs to the House only if those repairs could reasonably be made within ten working days. Determining also that no genuine issues of material fact existed that would have precluded summary judgment, we conclude that the trial court properly granted summary judgment in favor of Park Grill and denied summary judgment to Ms. Hall, dismissing her complaint.

V. Attorney's Fees

In the final sentence of the argument in her principal brief, Ms. Hall asserts that she is entitled to attorney's fees under the Lease due to Park Grill's alleged breach.

However, Ms. Hall did not raise an issue concerning attorney's fees in her statement of the issues. As our Supreme Court has explained:

> Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt.

*Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012); *see also Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue."). Therefore, we deem any issue concerning attorney's fees, whether at trial or on appeal, to be waived.

## VI. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court granting summary judgment in favor of Park Grill, denying Ms. Hall's motion for summary judgment, and dismissing Ms. Hall's complaint with prejudice. We remand this case to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, Faye Maples Hall, individually and as personal representative of the Estate of Alie Newman Maples.


s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE